IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CITIZENS FOR EQUAL PROTECTION, INC., a non-profit organization incorporated under the laws of Nebraska; NEBRASKA ADVOCATES FOR JUSTICE AND EQUALITY, INC., a non-profit organization incorporated under the laws of Nebraska; and ACLU NEBRASKA, a non-profit organization incorporated under the laws of Nebraska, | ) ) ) ) ) ) ) ) ) | 4:03CV3155 |
| | ) | MEMORANDUM AND ORDER |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ATTORNEY GENERAL JON C. BRUNING, in his official capacity, and GOVERNOR MICHAEL O. JOHANNS, in his official capacity, | ) ) ) ) ) | |
| Defendants. | ) ) | |

This case has been submitted to the court on the Joint Stipulation of Facts and supporting evidence, Filing No. 45; affidavits, Filing Nos. 46, 47, 48 and 50; and the trial briefs of the parties, Filing Nos. 65, 66 and 67. This is an action for declaratory and injunctive relief for deprivation of constitutional rights brought pursuant to 42 U.S.C. § 1983. Plaintiffs allege that Article I, Section 29 of the Nebraska Constitution ("Section 29") is unconstitutional as it is (1) a denial of equal protection and is (2) a bill of attainder. Section 29 of the Nebraska Constitution provides that "[o]nly marriage between a man and a woman shall be valid or recognized in Nebraska. The uniting of two persons of the same sex in a civil union, domestic partnership, or other similar same-sex relationship shall not

be valid or recognized in Nebraska." Neb. CONST. art. I, § 29.  Plaintiffs contend that

Section 29 denies them an equal opportunity to convince members of the Nebraska

Unicameral that same-sex relationships deserve some of the legal protections afforded to

other relationships.[1]  Filing No. 1, ¶ 4.  Plaintiffs ask the court to (1) declare that Section 29

violates the United States Constitution; (2) declare Section 29 a bill of attainder in violation

of Article I, Section 10 of the United States Constitution; (3) strike and permanently enjoin

its enforcement of Section 29; and (4) award reasonable attorney fees and costs pursuant

to 42 U.S.C. § 1988.  After careful consideration of the record, briefs, and the relevant case

law, the court finds that Article I, Section 29 of the Nebraska Constitution violates the

Constitution of the United States.

## _I. Facts_

The parties have filed a Joint Stipulation of Facts, with attached Exhibits 1 through

37.  Filing No. 45.  The parties stipulate, in relevant part, that plaintiffs Citizens for Equal

Protection, Inc. ("CFEP") and Nebraska Advocates for Justice and Equality ("NAJE") are

non-profit corporations, incorporated under Nebraska law in 1993 and 2000, respectively.

CFEP's mission is to eliminate discrimination based on sexual orientation through

legislation and education.  NAJE also works to end discrimination and has lobbied against

legislation that it believes discriminates based on sexual orientation or gender identity and

in favor of legislation that it believes protects the civil and political rights of lesbian, gay,

---

[1] The plaintiffs expressly disclaim an interest in recognition of same-sex marriages, civil unions or domestic partnerships as a remedy in this case.  They seek only "a level playing field, an equal opportunity to convince the people's elected representatives that same-sex relationships deserve legal protection" and "equal access, not guaranteed success, in the political arena."  Filing No. 1, ¶ 4.  The court is not asked to decide whether a state has the right to define marriage in the context of same-sex and opposite-sex relationships.

bisexual and transgender Nebraskans.  Plaintiff ACLU Nebraska is also a non-profit corporation, incorporated under Nebraska law.  Its purpose is to defend civil liberties and its work includes advancing the civil liberties of lesbian, gay and bisexual Nebraskans by lobbying in support of bills that seek to extend legal protections to lesbian, gay and bisexual people and lobbying against legislative efforts it believes discriminate on the basis of sexual orientation.  All three plaintiff organizations have lesbian, gay and bisexual members, including public employees.

Defendant Jon C. Bruning is the Attorney General of the State of Nebraska. The Attorney General is charged with enforcing the laws of the State of Nebraska (the defendants hereafter are collectively referred to as "the State"). The Attorney General is also charged, under Neb. Rev. Stat. § 84-205 (4) (1999), with giving "his or her opinion in writing upon all questions of law submitted to him or her" by various state officers, including the executive officers and members of the legislature.  Defendant Michael O. Johanns was at all material times the Governor of the State of Nebraska.[2]  The governor is charged with executing the laws of the State.  The parties stipulate that both defendants are sued in their official capacities only and were acting under color of state law at all times relevant to this action.

The citizens of Nebraska added Section 29 to the Nebraska Constitution through the initiative petition process.  The proposed amendment that became Section 29 was known as Initiative Measure 416 during the petition drive.  The Nebraska initiative petition process is set out in Art. III, §§ 2 and 4 of the Nebraska Constitution, and in the relevant portions

---

[2]After this lawsuit was filed, Governor Michael Johanns was appointed Secretary of Agriculture and Dave Heinemann became the Governor of Nebraska.  Pursuant to Fed. R. Civ. P. 25(d), Governor Heinemann is substituted as party defendant.

of the Nebraska Election Act, Neb. Rev. Stat. §§ 32-101 *et seq.* Under that process, sponsors of an initiative measure circulate petitions for signature by registered voters and, if a sufficient number of registered voters sign those petitions, a measure is placed on the ballot. Once a proposal is placed on the ballot, it is subject to majority vote to determine whether it will be adopted or rejected. In 2000, two officially-recognized ballot-issue committees, as well as other groups, promoted passage of Measure 416 to Nebraska voters. Those committees were the Defense of Marriage Amendment Committee ("DOMA Committee") and the Nebraska Coalition for the Protection of Marriage ("NCPM Committee"), both of whom met the threshold for reporting under the Nebraska Accountability and Disclosure statutes and filed documents with the Nebraska Accountability and Disclosure Commission. *See* Exhibit (hereinafter "Ex.") 1, Ex. 2, and Exs. 7 through 12.[3]

Both committees created materials, including television and radio advertisements, to support their efforts to encourage adoption of the amendment. *See* Exs. 3 through 6, ¶¶ 13 through 15. In those materials, proponents of the measure asked the voters to support the amendment in order to further define marriage, particularly since the Unicameral had been unable to pass such legislation. *See* Exs. 3, 4, 5 and 6. NCPM also sponsored a mailing to selected Nebraska voters prior to the November 2000 election outlining the reasons for Initiative 416, and purchased advertising space in the Omaha World-Herald using the text of that mailing. Ex. 16. The committees stated that the

---

[3]The parties have raised numerous objections to the admissibility of exhibits. The objections to any exhibits cited herein have been reviewed and are overruled. The court finds the exhibits cited herein are relevant. Further, the court generally notes that the parties' objections relate more to the weight to be afforded the evidence than to its admissibility.

objective of Measure 416 was to preserve the union between a man and a woman, and also stated the measure was necessary because other states had taken action to extend marital rights to same-sex couples.  *See* Exs. 17, 18, 19, 20 and 21.  The record includes several newspaper articles related to Measure 416.  *See* Exs. 22-26.

The parties have also stipulated that approximately 105,000 valid signatures of registered voters were required to place the proposed constitutional amendment on the 2000 Nebraska General Election ballot and that volunteer circulators gathered and submitted more than that number of signatures.  Between fifty percent and seventy-five percent of those petition signatures were gathered by volunteers associated with the Church of Jesus Christ of Latter Day Saints.  The remainder of the signatures were gathered by various volunteers and volunteer groups coordinated by the DOMA Committee.

Nebraska voters adopted Measure 416 as a part of the Nebraska Constitution in the General Election held on November 7, 2000.  The measure received majority approval in all 93 Nebraska counties.  The total final vote on Measure 416 was 477,571 in favor (70.1%), and 203,667 against (29.9%).  The measure, now codified at Art. I, § 29 of the Nebraska Constitution, became law on November 7, 2000, when it received the required number of votes and became effective on December 7, 2000, when Governor Johanns signed the Proclamation of Adoption.

Stipulated evidence further shows that state Senator Nancy Thompson introduced Legislative Bill ("LB") 671 in the Nebraska Legislature on January 14, 2003.  That bill would have provided the domestic partner of a deceased person with  the power and authority to

make an anatomical gift of and/or to dispose of the deceased's remains.[4]  Ex. 27.  The bill was referred to the Health and Human Services Committee of the Nebraska Legislature on January 24, 2003.  Senator Thompson requested an opinion of the Nebraska Attorney General on the constitutionality of the proposed legislation in light of Section 29.  The Attorney General responded to Senator Thompson's request and issued Op. Att'y Gen. No. 03004 (2003).  Ex. 28.

In the opinion, the Attorney General answered the following question: "If the Legislature Were to Grant Rights to A Domestic Partner to Donate Organs of a Decedent and Control the Disposition of a Decedent's Remains, Would Such Law Be Constitutional?" *Id.* at 1.  The Attorney General first noted that the Nebraska Constitution had been amended to include Initiative Measure 416 "[i]n response to concerns that a union of partners of the same sex may be considered lawful marriage in certain states and that the Full Faith and Credit provision of the U.S. Constitution may make it incumbent upon Nebraska to recognize it as a lawful marriage if the partners were to move to this state," and to "make it clear that only marriage between a man and a woman is to be valid or recognized in this state."[5]  *Id.*  The Attorney General then noted that under the second sentence of the amendment, "no legal recognition is to be accorded to the union of two persons of the same sex, regardless of whether one uses the  word 'marriage' or attaches

---

[4]The proposed legislation defined "domestic partner" as "a person who was in a committed relationship with the deceased person."  Evidence to establish such a "committed relationship" included: longevity of the relationship; joint ownership of a home; joint rental agreements; joint loan obligations; joint bank accounts, credit cards, investments, leases of vehicles; joint utilities; designations of the other as a beneficiary, or personal representative of each other's will; power of attorney for each other; or evidence the other was receiving domestic partner benefits from an employer.  See Ex. 27.

[5]The court notes that the Full Faith and Credit Clause does not necessarily require acknowledgment of marriages that occur in other states.  *See* Patrick J. Borchers, *The Essential Irrelevance of the Full Faith and Credit Clause to the Same-Sex Marriage Debate*, 38 Creighton Law Rev. 233, 353-364 (2005).

4016c665fd73bbcc

some other label to the relationship, such as 'civil union' or 'domestic partnership.'" *Id.* at 2. After outlining the provisions of the proposed legislation, the Attorney General concluded that the proposed legislation would amend Nebraska law and the Uniform Anatomical Gift Act to give a domestic partner the same right as a surviving spouse to control and direct the disposition of a decedent's remains—a right given priority over the rights of decedent's parents and children that has traditionally been reserved to the surviving spouse. *Id.* The Attorney General concluded that "such legislation would create new rights which spring from recognition of a domestic partnership; a partnership which could comprise same sex couples." *Id.* at 2. Because "the rights being created are *placed on the same plane as rights* which arise as a consequence of the marital relationship," the Attorney General found that the proposed legislation "would be *giving legal effect to a same sex relationship, thereby validating or recognizing it*," which would run counter to Section 29. *Id.* at 2-3 (emphasis added). The proposed legislation was not advanced out of the Health and Human Services Committee, and was on General File in the Nebraska Legislature when the 2004 session ended.[6]

Donna Colley and Margaux Towne-Colley, who are members of the plaintiff organizations, wrote to then-Governor Michael Johanns on October 30, 2002, expressing concern about health insurance, adoption, and inheritance issues in connection with the couple's move to Nebraska from Vermont, where their relationship had been recognized,

---

[6]The parties also stipulated that the Unicameral amended Legislative Bill 95 with Amendment No. AM1980, which provided that "authorized persons" could provide for the dispositions of those who are deceased. See Exs. 35, 36, § 71-1339, p. 27. An authorized person is defined as one who has an affidavit signed and sworn to by the decedent allowing for such disposition by that person. *Id.* Governor Johanns approved LB 95 on May 29, 2003. Ex. 37, 2003 Neb. Laws LB 95.

and the subsequent birth of a child in Nebraska. See Ex. 29. Governor Johanns responded:

> This letter is to respond to your faxed letter to me about your personal circumstances, particularly with the birth of [the child]. I do not doubt your sincerity or the depth of your concern for [the child], since your plans for his birth did not work out. However, I am sure you are aware of my beliefs about the sanctity of marriage, and that I supported the constitutional amendment providing that Nebraska would not give legal recognition to civil unions or domestic partnerships or other same-sex relationships. *With the adoption of that constitutional amendment, I see no resolution for you of the issues you discussed.*

Ex. 30 (emphasis added).

The evidence also shows that the Nebraska Legislature has adopted legislation in the past, notwithstanding issuance of an Attorney General Opinion that questioned the constitutionality of the legislation. *See* Exs. 31 and 32 (noting that a bill regarding future inmate appropriations passed even though the Attorney General opined that it would be unconstitutional). Correspondingly, the evidence shows that the Nebraska Legislature has also abandoned certain legislation after issuance of Attorney General opinions that questioned the constitutionality of the legislation. See Exs. 33 and 34 (regarding position of Attorney General pertaining to creation of the position of "Counsel to the Legislature" in a bill as an unconstitutional violation of the separation of powers clause). The bill did not pass into law and no similar law has been passed since the issuance of the Nebraska Attorney General opinion.

Several members of plaintiff organizations have submitted affidavits showing that Section 29 has inhibited them from lobbying for extension of rights to gay and lesbian couples and has interfered with their ability to provide for themselves and their families.

See Exs. 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49 and 50.[7] The evidence shows that plaintiffs' members for the most part are gay or lesbian couples, most employed as professionals, who are in long-term committed relationships, many of whom have and are raising children. *See id.*

## II. Discussion

### A. The Constitutional Deprivation - First Amendment

The threshold issue in the court's constitutional analysis is the identification of the right that is said to have been infringed by the enactment of Section 29. Plaintiffs assert that Section 29 is unconstitutional because "it erects a discriminatory barrier to advocacy for any form of government recognition" of committed same-sex relationships. Filing No. 1. Plaintiffs also assert that the amendment amounts to an unconstitutional bill of attainder, inflicting punishment by excluding "gay people from the normal processes by which other Nebraskans can advocate to protect their families," which is akin to a political disenfranchisement or disqualification. *See id.* However characterized, the court finds that the deprivation occasioned by the passage of Section 29 is the deprivation of the right to associational freedom protected by the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution and the right to petition the government for redress of grievances, which encompasses the right to participate in the political process,

---

[7]Plaintiffs offered numerous affidavits stating that plaintiffs' members would advocate, absent Section 29, at state, local and private levels for rights, obligations and benefits, including (1) those who wish to advocate for passage of the Financial Responsibility and Protection for Domestic Partners Act: Ex. 49, ¶¶ 19-20 (a homemaker); Ex. 47, ¶ 7 (a health care consultant); Ex. 46, ¶ 5 (a college instructor); Ex. 45, ¶¶ 10-11 (a minister); Ex. 43, ¶¶ 15-16; Ex. 42, ¶¶ 8-9 (a not-for-profit director of public relations); Ex. 41 (a software developer); Ex. 40, ¶¶ 19-22 (the ACLU); Ex. 39, ¶¶ 17-20 (the President of NAJE); (2) those who wish to advocate for local ordinance and city changes: Ex. 39, ¶¶ 17-20; Ex. 38, ¶¶ 21-23 (CFEP); and (3) those who want to advocate for change in laws for public and corporate employers: Ex. 44, ¶¶ 12-13; Ex. 42, ¶ 7; Ex. 41, ¶ 9 (a software developer); Ex. 48, ¶ 4 (a corporate supervisor); Ex. 39, ¶¶ 17-20; and Ex. 38, ¶ 21-23 (CFEP).

also protected by the First Amendment.  The elucidation of the constitutional deprivation at issue is preliminary to any finding that Section 29 violates either the Equal Protection Clause or a finding that Section 29 amounts to an unconstitutional bill of attainder and is, thus, properly before the court.[8]

The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  U.S. CONST. amend I.  "The hallmark of the protection of free speech is to allow 'free trade in ideas'–even ideas that the overwhelming majority of people might find distasteful or discomforting."  *Virginia v. Black*, 538 U.S. 343, 357 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).   An individual's interest in self-expression is a concern of the First Amendment separate from the concern for open and informed discussion, although the two often converge.  *First Nat'l Bank of Boston v. Belloti,* 435 U.S. 765, 776 n.12 (1978) (identifying "the inherent worth of the speech in terms of its capacity for informing the public" as "more than self-expression; it is the essence of self-government," and noting "self-government suffers when those in power

---

[8]First Amendment and Equal Protection issues are closely intertwined.  Because intrusions on First Amendment rights are often accompanied by an invidious or irrational animus against a certain group, a First Amendment infringement can also be analyzed as the deprivation of a fundamental interest under the Equal Protection Clause when accompanied by proof of such discriminatory animus.  Notwithstanding any finding that the plaintiffs have proved the other elements of either an Equal Protection or bill of attainder violation, a showing that Section 29 infringes First Amendment rights, standing alone, could render the provision unconstitutional unless the State could show either that the amendment is narrowly tailored to serve a compelling state interest or "'closely drawn' to match a 'sufficiently important interest.'"  *See Federal Election Comm'n v. Beaumont*, 539 U.S. 146, 161 (2003) (noting the level of scrutiny is based on the importance of the "political activity at issue" to effective speech or political association).  In light of the court's finding in the Equal Protection section of this opinion that the defendants cannot justify the amendment under deferential "rational basis" review, the court need not discuss the more stringent level of scrutiny.  *See, e.g., Romer v. Evans*, 517 U.S. 620, 630 (1996) (applying rational basis review in circumstance similar to those presented in this case).

suppress competing views on public issues 'from diverse and antagonistic sources.'"). The First Amendment "presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for the truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503-04 (1984); *see also Belloti,* 435 U.S. at 776 (noting that the Constitution often protects interests broader than those of the party seeking their vindication and that the First Amendment in particular serves important societal interests). The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Moreover, "[t]he voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens against Rent Control/Coalition for Fair Housing v. City of Berkeley,* 454 U.S. 290, 295 (1981).

The right to free speech encompasses the right to association, which is constitutionally protected in two distinct senses:  freedom of expressive association and freedom of intimate association. *Roberts v. United States Jaycees,* 468 U.S. 609, 617-18 (1984).  Expressive association—the right to associate for the purpose of engaging in those activities protected by the First Amendment (speech, assembly, petition for the redress of grievances, and the exercise of religion)—is governed by First Amendment principles. *Id.* at 618 (noting that "[t]he Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.").  Intimate association, characterized as "choices to enter into and maintain certain intimate human relationships" receives protection as a fundamental element of personal liberty under the Due Process Clause. *Id.* at 617-18; *Bellotti*, 435 U.S. at 778 (stating "the liberty of speech and of the

11

press which the First Amendment guarantees against abridgment by the federal government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment").[9]  These two constitutionally-protected freedoms can coincide particularly when the state interferes with an individual's selection of those with whom they wish to join in a common endeavor.  *Roberts,* 468 U.S. at 618.

The right to expressive association protects the vigorous advocacy of lawful ends. *NAACP v. Button*, 371 U.S. 415, 429 (1963) (finding that litigation is a form of political expression—"a means for achieving the lawful objectives of equality of treatment"—that the state could not restrict under its power to regulate the legal profession).  Organizational activity, whereby citizens seek through lawful means to achieve legitimate political ends, is protected as a component of this right to associate to advance beliefs and ideals.  *Id.* at 430; *see also California Democratic Party v. Jones*, 530 U.S. 567, 573 (2000) (stating "the First Amendment protects the freedom to join together in furtherance of common political beliefs").  Thus, the right to free speech includes the right to attempt to persuade others to change their views, and it may not be curtailed simply because the speaker's message may be offensive to his audience.  *Hill v. Colorado*, 530 U.S. 703, 715 (2000).  Indeed, "political belief and association constitute the core of those activities protected by the First Amendment."  *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality opinion).

"An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State

---

[9]Indeed, the First Amendment's ban on government abridgment of speech and peaceable assembly "anchors all [of the decisions relating to a due process liberty interest] most firmly in the Constitution's explicit text."  Laurence H. Tribe, *Lawrence v. Texas: The 'Fundamental Right' That Dare Not Speak Its Name,* 117 Harv. L. Rev. 1893, 1939-40 (April 2004).

unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622; *see also Berkeley*, 454 U.S. at 294 (involving ordinance placing monetary limits on contributions to ballot measures). "According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Roberts*, 468 U.S. at 622; *Button*, 371 U.S. at 431(finding that the activities of the NAACP are modes of expression and association protected by the First and Fourteenth Amendments); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (finding compelled disclosure of affiliation with groups engaged in advocacy a restraint on freedom of association). Thus, "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622; *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 906, 911-12 (1982) (holding that a boycott is constitutionally protected activity and that "[t]he established elements of speech, assembly, association, and petition, 'though not identical, are inseparable,'" (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)) and are vehicles through which citizens can effect social and economic change and thereby "change a social order that had consistently treated them as second-class citizens"). *See also Gay Lib v. Univ. of Missouri*, 558 F.2d 848, 853 n.9 (8th Cir. 1977) (finding it inimical to First Amendment values to deny individuals "the fundamental right to meet, discuss current problems, and to advocate changes in the status quo" (quoting *Gay Alliance of Students v. Matthews*, 544 F.2d 162, 166 (4th Cir. 1976))).

The Constitution's protection is not limited to direct interference with fundamental associational rights, but extends to indirect infringement of those rights. *Healy v. James*, 408 U.S. 169, 183 (1972) (finding state university's denial of official recognition, without justification, to an unpopular college organization burdens or abridges members' First Amendment associational rights). Accordingly, the possible ability of a group or association to pursue goals by other means will not significantly ameliorate the disabilities imposed by a restraint on freedom of association. *See id.* at 182-83*; Romer v. Evans,* 517 U.S. 620, 631 (1996) (stating that even if homosexuals could find some safe harbor in laws of general application, a constitutional amendment similar to that at issue herein would still impose a special disability on them).

Regarding freedom of intimate association, the Bill of Rights, designed to secure individual liberty, affords the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the state. *Roberts*, 468 U.S. at 618. The constitutional shelter afforded such relationships reflects the realization that "individuals draw much of their emotional enrichment from close ties with others" and "[p]rotecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty." *Id.* at 619. The First Amendment protects those relationships "that by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id.; see also Board of Directors of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 544-45 (1987). These protected relationships are "distinguished by such attributes as relative smallness, a high degree of selectivity in

14

decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship" and generally "only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty."  *Roberts,* 468 U.S. at 620.

The intimate relationships that have been accorded full constitutional protection are marriage, the begetting and bearing of children, child-rearing and education, and cohabitation with relatives.  *Rotary Int'l,* 481 U.S. at 545 (1987).  However, the legal status of, or state sanction upon, a relationship is not controlling.  *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (noting that the law has not "refused to recognize those family relationships unlegitimized by a marriage ceremony"); *Levy v. Louisiana,* 391 U.S. 68, 71-72 (1968), and *Glona v. American Guarantee & Liability Ins. Co.*, 391 U.S. 73, 75 (1968) (holding that a state may not condition recovery for wrongful death on legitimacy and noting "the Equal Protection Clause necessarily limits the authority of a State to draw such 'legal' lines as it chooses").  Moreover, constitutional protection has not been limited to relationships that involve biological family members.  *Rotary Int'l,* 481 U.S. at 545; *Smith v. Organization of Foster Families For Equality and Reform,* 431 U.S. 816, 845-46 (1977) (noting a limited liberty interest in foster family).  At the unprotected end of the spectrum are cases that involve business associations and encounters limited in duration and depth. *See, e.g.*, *Rotary Int'l*, 481 U.S. at 546 (holding that relationship among Rotary Club members is not the type of intimate relationship that is constitutionally protected); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 237 (1990) (finding that patrons of motel, which limited rental of rooms to ten hours, did not have the type of intimate relationship protected by the Constitution); *City of Dallas v. Stanglin,* 490 U.S. 19, 24 (1989) (stating that dance hall

15

patrons were not engaged in the sort of intimate or expressive association the First Amendment has been held to protect).

Between the opposing poles of a marital relationship on one hand and a large business enterprise on the other, lie "a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State." *Roberts, 468* U.S. at 620 (noting that determination of the limits of state authority over an individual's freedom to enter into a particular association involves "a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments)." *See also Lawrence v. Texas*, 539 U.S. 558 (2003) (invalidating statute criminalizing sodomy on due process grounds and holding that the fact that the governing majority in a state has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting private consensual sexual behavior.)

A corresponding right under the First Amendment protects "the right of the people to petition the Government for a redress of grievances." U.S. CONST. amend. I. It is recognized as one of "the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois Bar Assn.*, 389 U.S. 217, 222 (1967). This right is similar to and frequently overlaps the other guarantees of free expression. *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. at 909-12 (a boycott is afforded First Amendment protection and stating that "free trade in ideas" means free trade in the opportunity to persuade to action). Thus, the government may not regulate political activity so as to prevent associating for "mere solicitation of governmental action with respect to the passage of laws." *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365

16

U.S. 127, 138 (1961) (finding that a violation of Sherman Anti-Trust Act cannot be premised on an invasion of the right to petition); *Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 626 (1969) ("Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government"); *Hunter v. Erickson*, 393 U.S. 385, 390-91 (1969) (holding that a political majority may not restructure the political process to make it more difficult for a political minority to obtain favorable government action in a race discrimination case).

Claims that involve this "First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views" allege a violation of First Amendment rights.  *See Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring) (questioning the value of Equal Protection analysis to gerrymandering cases and noting that the inquiry is not whether a generally permissible classification has been used for an impermissible purpose, but "whether the legislation burdens the representational rights of the complaining party's voters for reasons of ideology, beliefs, or political association"); *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 222-23 (1989) (holding that a ban on primary endorsements affects speech at the core of the electoral process and of the First Amendment freedoms); *Anderson v. Celebrezze*, 460 U.S. 780, 792 (1983) (stating that "[t]he inquiry is whether the challenged restriction unfairly or unnecessarily burdens 'the availability of political opportunity'" and finding that an early filing deadline placed "a particular burden on identifiable segment of voters" and impinged "associational choices protected by the First Amendment"); *Williams v. Rhodes*, 393 U.S. 23, 32 (1968) (stating "[c]ompetition in ideas and governmental policies is at the

core of our electoral process and of the First Amendment freedoms."). The right to petition extends to all departments of the government. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (concluding that "it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors").

The "fundamental right to participate equally in the political process" can be impinged by a state constitutional amendment that "alters the political process so that a targeted class is prohibited from obtaining legislative, executive, and judicial protection or redress from discrimination absent the consent of a majority of the electorate through the adoption of a constitutional amendment." *Evans v. Romer*, 854 P.2d 1270, 1282, 1285 (Colo. 1993) ("*Evans I*") (noting that "[s]uch a structuring of the political process undoubtedly is contrary to the notion" that the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications), *aff'd on other grounds,* 517 U.S. 620 (1996). Contrary to the State's contention, the United States Supreme Court has not rejected that proposition. *See Romer v. Evans*, 517 U.S. at 626.

The Supreme Court identified essentially the same constitutional injury in *Romer* as the Colorado Supreme Court had identified. *Id.* at 627-28 (stating the "[t]he 'ultimate effect' of Amendment 2 is to prohibit any governmental entity from adopting similar, or more protective statutes, regulations, ordinances, or policies in the future unless the state constitution is first amended to permit such measures" and noting that a "sweeping," "comprehensive" and "far-reaching" "change in legal status" was effected by the law,

18

vis-a-vis the "structure and operation of modern anti-discrimination laws" barring "homosexuals from securing protection against the injuries that these public accommodation laws address"). The court identified the injury as more than a mere deprivation of "special rights" to homosexuals, but as the withholding of the protections "taken for granted by most people either because they already have them or do not need them; these are protections against exclusion from an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society" and recognized the "special disability" imposed on homosexuals was that the class was "forbidden the safeguards that others enjoy or may seek without constraint" in that "[t]hey can obtain specific protection against discrimination only by enlisting the citizenry of Colorado to amend the State Constitution." *Id.* at 631. Having identified the injury, the Supreme Court found that Amendment 2 "fail[ed], even defi[ed]," the conventional inquiry of whether a law, assuming it neither burdens a fundamental right nor targets a suspect class, "bears a rational relation to some legitimate end." *Id.* at 631-32. It was, thus, not necessary for the court to engage in strict-scrutiny analysis.[10]

Identification of a First Amendment deprivation subjects the challenged enactment to examination for vagueness and overbreadth. *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). An imprecise law can be attacked for overbreadth, which permits the invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial in relation to the statute's legitimate sweep, *id.*, or

---

[10]The Court tangentially noted but did not address the issue that "at some point in the systematic administration of these [anti-discrimination] laws, an official must determine whether homosexuality is an arbitrary and, thus, forbidden basis for decision," thus amounting to a decision that would "itself amount to a policy prohibiting discrimination on the basis of homosexuality" and, thus, run afoul of the amendment. *Romer v. Evans,* 517 U.S. at 630 (noting that this consequence would compound the constitutional difficulties).

vagueness, because the law fails to establish standards that are sufficient to guard against the arbitrary deprivation of constitutional rights. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

As applied to the undisputed facts of this case, the court finds that Section 29, as written and as applied, imposes significant burdens on both the expressive and intimate associational rights of plaintiffs' members and creates a significant barrier to the plaintiffs' right to petition or to participate in the political process. Although not central to disposition of this case, the court finds Section 29 burdens rights of intimate association. The amendment goes far beyond merely defining marriage as between a man and a woman. By its terms, Section 29 mandates that Nebraska will not recognize or give effect to "the uniting of two persons" in a same-sex relationship "similar to" marriage. This language, especially given the expansive reading it has been afforded in Nebraska, potentially prohibits or at least inhibits people, regardless of sexual preference, from entering into numerous relationships or living arrangements that could be interpreted as a same-sex relationship "similar to" marriage.[11]

Because the identifying incidents of marriage vary, numerous living arrangements can be interpreted as "similar to" marriage. *See infra*, in discussion of Equal Protection claim. Marriage cannot be identified or defined solely by sexual, procreational or financial aspects. Many social or associational arrangements run the risk of running afoul of the broad prohibitions of Section 29. Among the threatened relationships would be those of

---

[11]This analysis appears to beg the question, "What is marriage?" However, the court need not decide whether and to what extent Nebraska can define or limit the state's statutory definition of marriage. The court holds only that the prospective prohibition of any relationship "similar to" marriage is both exceedingly vague and overly broad.

roommates, co-tenants, foster parents, and related people who share living arrangements, expenses, custody of children, or ownership of property.  Many of these associational relationships are constitutionally protected at some point along the spectrum from the most hallowed and intimate to the most trivial.  Without determining where on this spectrum a potential domestic partnership, civil union or other "same-sex" relationship would fall, let it suffice to say that associations or living arrangements affected by Section 29 are closer to the end of the continuum that deserve Constitutional protection. [12]

Section 29 also interferes with individuals' abilities or incentives to join together in pursuit of a common endeavor.  Nebraska's amendment has expansive reach.  The State reads the amendment as rendering unconstitutional any proposed legislation that would elevate a same-sex relationship or agreement to the same plane as married persons.  A broad range of potential legislation falls under the purview of Section 29.  Proponents of legislation that would extend rights or benefits to same-sex relationships are discouraged and/or dissuaded from enthusiastic advocacy of such goals by the State's expressed conclusion that most such legislation would violate the Nebraska Constitution.  Section 29 significantly chills the incentive to associate and to organize in pursuit of those goals.  The ability of proponents to garner support and financial backing for the pursuit will necessarily be diminished by Section 29. The result of the amendment is to discourage or impair the

---

[12]Notably, Section 29 potentially impinges other associational relationships than those that would comprise a "domestic partnership," "civil union" or "similar same-sex relationship" involving a gay couple. *See infra* in the Equal Protection discussion.  Section 29's broad proscriptions could also interfere with or prevent arrangements between potential adoptive or foster parents and children, related persons living together,  and people sharing custody of children as well as gay individuals and people inclined to align with them to promote changes in legislation.

formation of groups and/or associations to lobby for changes in legislation that would benefit same-sex couples.

Most importantly, in addition to burdening intimate and expressive associational rights, Section 29 erects significant burdens on the promotion of, or lobbying for, any legislative or governmental action that would eventually extend rights or recognition to gays and lesbians, or for that matter, would change the status quo concerning numerous applications of family law, custody, or adoption issues, thus affecting citizens other than gays or lesbians. *See infra*, discussion in Equal Protection part of this opinion. In its brief, the State admits that "[p]laintiffs have full access to the political process and may obtain the rights via legislation which married couples enjoy, so long as those rights are not premised on recognition of a same-sex relationship." Filing No. 66, Defs.' Trial Brief at 11. The fallacy of the State's circular logic is apparent. In making this statement, the State concedes that full access to the political process and enjoyment of rights of married couples will be forbidden if premised on the recognition of a same-sex relationship. The evidence shows that the State regards any proposed legislation that would elevate a same-sex couple to the "same plane" as a married couple amounts to "a recognition" of the same-sex relationship. Marital status confers many rights that single people—gay or straight, parents or not—do not possess. Notwithstanding policies preferring marriage, there are or may be legitimate reasons, consistent with the goals of promoting stable family relationships and protecting children, for extending some rights or obligations traditionally linked to marriage to other relationships. A blanket prospective prohibition on any type of legal recognition of a same-sex relationship not only denies the benefits of favorable legislation to these

groups, it prohibits them from even asking for such benefits.  The State's admissions establish that  legislation seeking to extend any benefits once incident to or dependent on the marital relationship to a same-sex couple would violate Section 29.   Indeed, enforcement of Section 29, as the State interprets the provision, could void numerous existing contracts, labor agreements and corporate policies that extend to same-sex partners any benefits once offered only to spouses.  This is tantamount to denial of access to the means to effect any sort of social or political change.  The knowledge that any such proposed legislation violates the Nebraska Constitution chills or inhibits advocacy of that legislation, as well as impinging on freedom to join together in pursuit of those ends.  Proponents of any legislation that would enhance same-sex partner's rights (including awarding benefits, allowing adoption, etc.) must surmount the hurdle of passing a constitutional amendment.  This creates a barrier to participation in the political process that no minority population is ever likely to surmount.

## B.  Equal Protection

Plaintiffs contend that Section 29 violates their Fourteenth Amendment rights to Equal Protection and Due Process.[13]  Plaintiffs do not seek any determination of the validity of the State of Nebraska's definition of marriage as a relationship between a man and a

---

[13]In the context of this case, the Equal Protection allegations involve an intrusion on First Amendment rights motivated by an invidious or irrational categorization, that is, the stifling of rights is alleged to have been discriminatory.  *See, e.g., Police Dep't of Chicago v. Mosely*, 408 U.S. 92, 96 (1972) (different treatment of speakers by police triggered equal protection guarantees as well as First Amendment guarantee); *Gay Alliance of Students v. Matthews*, 544 F.2d at 166.  As noted, the First Amendment and Equal Protection issues are closely intertwined.

woman.[14]  Plaintiffs seek the ability to advocate for the extension of some rights historically associated with marriage.[15]

---

[14]None of the parties have raised the issue of whether the two sentences of Section 29 could be considered separately, so as to find Section 29's first sentence constitutional, if its second sentence were not. Although plaintiffs' contentions focus primarily on the second sentence of Section 29, plaintiffs specifically argue that Section 29 in its entirety violates the Equal Protection Clause in their complaint and during their trial brief in this case.  *See* Filing No. 1, Complaint at 1; Filing No. 65, Pls.' Trial Brief at 2.  Although the State attempts in its polemic trial  brief to argue that this case is really about sentence two of Section 29, the State has not  briefed or argued that Section 29 can be severed.  The court interprets the parties' positions as an acknowledgment that Section 29 embodies one concept that cannot be severed.

The court will briefly address the severability of the provision.  The issue of severability is one of state law.  *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996); *Dakota, Minnesota & Eastern R.R. Corp. v. South Dakota*, 362 F.3d 512, 518 (8th Cir. 2004).  If legislation or a constitutional amendment embodies a single concept, then it is not severable. *Duggan v. Beerman*, 544 N.W.2d 68, 78 (Neb. 1996) (single concept is not severable). Whether intended to be single concept or not cannot be determined by voter intent.  *Id.* at 78.  The court should not guess voter intent.  *Id.* at 80.  *See also Jaksha v. State*, 486 N.W.2d 858, 873 (Neb. 1992) (four-part test for determining severability); *Omaha Nat'l Bank v. Spire*, 389 N.W.2d 269, 279 (Neb. 1986) (no way to determine intent of voters).  A voter could have voted for Section 29 for a number of reasons.  See Exs. 3, 4, 5, 6, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 201, 202, 203, 204 and 209 (full faith and credit issues, religion, definition of marriage, failure of Unicameral to pass legislation, fear that children will be taught that homosexuality and heterosexuality are morally equal and good, belief that homosexuality is wrong, among others).  The court is unable to discern the intent of the voters.  Because Section 29 contains no severability clause, the court assumes that the voters perceived it as one amendment, that is, a total concept.  Moreover, the drafters of the proposed amendment considered and rejected a proposal that was limited to the first sentence.  *See* Christopher Rizzo, *Banning State Recognition of Same-sex Relationships: Constitutional Implications of Nebraska's Initiative 416*, 11 J. L. & Pol'y 1, 28 and n. 92 (2002).  The court thus finds that Section 29 must be considered to be a single concept, not subject to severance.  The court expresses no opinion on the constitutionality, standing alone, of the first sentence of Section 29, because that question has not been presented to the court.

[15]Various state and federal laws have historically granted benefits and protections to spouses.  *See, e.g.*, Uniform Probate Code § 5-310(a)(4) (establishing order of preference for the appointment of a guardian for an incapacitated person, with spouse ahead of adult children or parents); Neb. Rev. Stat. § 71-1339 (providing the spouse has first right to claim a person's remains and to make anatomical gifts of parts of the deceased person's body absent any express directive to the contrary); Neb. Rev. Stat. § 30-810 (authorizing wrongful death action for benefit of widow or widower); 26 U.S.C. § 6013, § 2056 (married couples can file joint tax returns and qualify for estate tax deductions under the I.R.S. Code); 29 U.S.C. § 1002(15) (under ERISA, relative entitled to benefits means "a spouse, ancestor, lineal descendant, or spouse of a lineal descendant"); 42 U.S.C. § 402 (married persons are entitled to survivor's benefits under Social Security Act); 38 U.S.C. § 1310 (spouse is entitled to veteran's benefits); 29 U.S.C. § 2612(a)(1)(c) (Family Medical Leave Act (FMLA) requires employers to provide medical leave to care for a seriously ill spouse); 8 U.S.C. § 1151(b)(2)(A)(i) (spouses accorded preferential treatment in connection with immigration).

The law also confers benefits on married people in connection with parenting, even in the absence of a biological connection with the child.  *See, e.g.*, 42 U.S.C. § 416(e)(2) (dependent children, including stepchildren, entitled to income benefits upon death, retirement or disability of a parent); Neb. Rev. Stat. § 48-124 (stepchildren can be entitled to workers' compensation and survivor benefits); *Soto v. Soto*, 659 N.W.2d 1, 11 (Neb. 2003) (same); 29 U.S.C. §§ 2611(12) & 2612(a)-(d) (1994) (FMLA covers care of seriously ill stepchild); Neb. Rev. Stat. § 43-101 (relaxed adoption requirements and simplified procedures to stepparents);

The institution of marriage is difficult to define and/or describe.  *See* 1 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 2.1 at 81 (2d ed. 1988) ("[c]ontemporary marriage cannot be legally defined any more precisely than as some sort of relationship between two individuals, of indeterminate duration, involving some kind of sexual conduct, entailing vague mutual property and support obligations, a relationship which may be formed by consent of both parties and dissolved at the will of either").  That said, certain elements generally serve to identify a civil marital relationship.  Civil marriage is a creature of statute.  *See, e.g.*, Neb. Rev. Stat. § 42-101; *but see Edmunds v. Edwards*, 287 N.W.2d 420, 425 (1980) (acknowledging that, although by statute marriage is a civil contract, it does not resemble any other contract with which the courts have to deal; "[w]hat persons establish by entering into matrimony, is not a contractual relation, but a social status," (quoting *University of Michigan v. McGuckin*, 89 N.W. 778, 779 (Neb. 1902).

---

*In re Adoption of T.K.J. and K.A.K.*, Nos. 95CA0531, 95CA0532, 1996 WL 316800 (Colo. Ct. App. June 13, 1996) (holding that only a person married to a biological parent  is eligible for stepparent adoption); Adoption Law and Practice § 1.05(2), § 2.10(3) (Joan H. Hollinger ed., 1990) (same); Lori B. Andrews, *Alternative Reproduction and the Law of Adoption, in Adoption Law and Practice* §14.02 (regarding parenthood by surrogacy or artificial insemination, a spouse is generally considered a legal parent for all purposes, while a nonspouse can achieve recognition as parent only through formal process of adoption); Unif. Parentage Act, §§ 701-07, 9B U.L.A. 354-59 (2002) (same).  Also, adoption and/or foster parenthood is prohibited to single people and homosexuals in some jurisdictions.  *See* Fla. Stat. ch. 63.042(3) (homosexuals); N.H. Rev. Stat. Ann. §170-B:4 (two unmarried people); *Lofton v. Secretary of Dep't of Children and Family Services*, 358 F.3d 804 (10th Cir. 2004).  *See also In re Adoption of Luke,* 640 N.W.2d 374, 382-83 (Neb. 2002) (holding that a biological parent's rights must be terminated or relinquished in order for a child to be eligible for adoption by any adult other than a stepparent, effectively precluding adoptions by two unmarried persons if one is a biological parent).

Notwithstanding the elevated status of marriage, several states and municipalities have extended some benefits historically connected to the marital status to others.  *See, e.g.*, 1997 Haw. Rev. Stat. §§ 572C-4, 572C-5 (providing for registration of "reciprocal beneficiaries"); 15 Vt. Stat. Ann.  § 1201 (2000) (providing domestic partner registry); Cal. Fam. Code § 297.5 (providing domestic partner registry for same-sex couples and couples over the age of 62); Minneapolis, Minn., Ordinance 91-08-015; Ithaca, N.Y. Mun. Code, ch 7; San Francisco, Cal., Admin. Code §§ 62.1-62.8.  These laws or ordinances generally provide for some system of registration and procedure for dissolution of the partnerships and grant rights related to hospital visitation and medical decision-making to partners and also entitle partners of municipal employees to employment benefits.  *See generally id.*

Although it is a civil contract, the consent of the parties alone cannot establish a marriage; the consent of the state is also required. *Edmunds,* 287 N.W.2d at 425. The state's interests in marriage and family life are "'rooted in the necessity of providing an institutional basis for defining the fundamental relational rights and responsibilities of persons in organized society.'" *Knight v. Superior Court*, 26 Cal. Rptr. 3d 687, 698 (Cal. App. 2005) (finding that statutory provision of domestic partner status does not contravene definition of marriage as a contract between a man and a woman) (quoting *Laws v. Griep*, 332 N.W.2d 339, 341 (Iowa 1983)).

Plaintiffs seek only "a level playing field" that would permit them to access the Nebraska Unicameral to lobby for legal protections that have already been permitted in other states.[16] Plaintiffs assert that they seek only to *advocate* to members of the

---

[16]The fifty states have various laws dealing with same-sex unions: Massachusetts permits same-sex couples to obtain marriage licenses; five states (Connecticut, New Jersey, New Mexico, New York, and Rhode Island) and the District of Columbia have no explicit provisions that prohibit same-sex marriages; three states have laws predating 1996 that define marriage as between a man and a woman (Maryland, Wisconsin and Wyoming); twenty-five states have passed laws that define marriage as between a man and a woman and will not honor marriages between same-sex couples in other jurisdictions (Alabama, Arizona, California, Colorado, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Maine, Minnesota, New Hampshire, North Carolina, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia); three states have amended their state constitutions to declare marriages to be between a man and a woman only (Nebraska, Nevada, and Oregon); and thirteen states have amended their Constitutions and passed laws to define marriage and to refuse to honor same-sex marriages from other jurisdictions (Alaska, Arkansas, Georgia, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, North Dakota, Ohio, Oklahoma, Oregon, and Utah). William C. Duncan, *Whither Marriage in the Law?* 15 Regent L. Rev. 119, 120-21, nn. 9-11 (2002-03). In the general elections in November 2004, eleven states passed state constitutional amendments: Arkansas, Georgia, Kentucky, Michigan, Mississippi, Montana, North Dakota, Ohio, Oklahoma, Oregon, and Utah. See Kavan Peterson, *Fifty State Rundown on Same Sex Marriage Laws*, available at http://www.stateline.org. In April 2005, the Connecticut House of Representatives passed legislation that would permit civil unions for same-sex couples but also passed language defining marriage as between one man and one woman and the bill was signed into law on April 20, 2005. *See* http://www.washintongtonpost.com, April 13 2005; Susan Haigh, *Connecticut Becomes Second State to Approve Gay Unions After Governor Signs Bill*, http://abcnews.com, April 21, 2005. Notably, no state has amended its Constitution with language as broad as Nebraska. *See, e.g.*, Nev. CONST. art. I, § 21; Or. CONST. art. XV, § 5a.

A New York state court judge recently ruled that denying a same-sex couple the right to marry violates the New York State Constitution's Equal Protection and Due Process Clauses. *Seymour v. Holcomb*, 790 N.Y.S.2d 858 (N.Y. App. Div. 2005) (en banc). The Oregon Supreme Court, however, recently invalidated

Unicameral for passage of legislation that would make domestic partners responsible for each others' living expenses; allow a partner hospital visitation; provide for a partner to make decisions regarding health care, organ donations and funeral arrangements; permit bereavement leave; permit private employer benefits; allow survivorship, intestacy and elective share; and permit same-sex couples to adopt children.  Filing No. 45, Ex. 27.  As an example, plaintiffs note that Iowa provides health insurance to domestic partners of state employees, and under Section 29, as interpreted by the Attorney General, Nebraska employers will question the validity of such benefits and whether they can be offered in Nebraska.[17]

As its objective for the amendment, the State contends that the purpose of Section 29 is to preserve marriage as the union between a man and a woman, to promote procreation and family life, and to ensure that Nebraskans are not forced to recognize same-sex marriages from other jurisdictions.  *See* Exs. 3 and 4 (preservation of traditional marriage); Ex. 6 (to stop potential challenges to Nebraska marriage laws from those whose same-sex unions have been legitimatized in other states); Exs. 15, 17, 19, 21, 203 and 204 (to define marriage as between a man and a woman).  Interestingly, although procreation

---

a same-sex marriage on statutory grounds. *Li v. State*, — P.2d —, 2005 WL 852319 (Or. 2005).  A California Court of Appeals recently found that the state's domestic partner law did not conflict with a voter initiative limiting marriage to a man and a woman. *Knight v. Super. Ct. of Sacramento County*, 29 Cal. Rptr. 3d 687, 698 (Cal. App. 2005).

[17]Recently, the City of Omaha proposed a labor contract with the Omaha Police Union that included benefits for same-sex domestic partners.  The parties and attorneys debated the constitutionality of the proposal in light of Initiative 416.  Joseph Morton, *2000 Vote Invoked in Debate Over Police Benefits*, Omaha World-Herald, April 6, 2004.  This provides a good example of the chilling effect Section 29 has had on those wishing to advocate for partnership rights.  *See* testimony given at Omaha City Council Meeting concerning Police Union Contract, tapes dated May 4, 2004, and May 11, 2004.  *See also* Heidi Eischen, *For Better or for Worse: An Analysis of Recent Challenges to Domestic Partner Benefits Legislation*, 31 U. Tol. L. Rev. 527, 531 (2000).

is argued to be the primary rationale for Section 29, few of these exhibits mention procreation as a primary reason for passage of this amendment.

Defendants principally argue that

there is no civil right to win a political battle. There is no civil right to control the terms on which a political battle will be fought, i.e., on a local, employer-by-employer, or legislative level rather than on a state-wide voter initiative level . . . nor do they have a constitutional right to overturn a political defeat through the federal courts.

Filing No. 66, Defs.' Trial Brief at 1. Defendants further argue: "Plaintiffs started the political fight that resulted in adoption of Section 29. They began participating in the political process by advocating for homosexual rights before anyone began talking about amending the Nebraska Constitution to protect marriage." *Id.* at 3. Defendants contend that this is purely a political, not a constitutional issue. The State's primary contention is that the citizens of the State of Nebraska have a right to define marriage as they see fit.[18]

In general, the Fourteenth Amendment to the United States Constitution provides that no person shall be denied equal protection of the laws. U.S. CONST. amend. XIV. With that said, most laws classify, in one way or another, and such classification results in a disadvantage to persons or groups. *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 271-272 (1979). "The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.'" *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)). Consequently, a law that neither burdens a fundamental right nor targets a suspect class will be upheld as long as the classification

_____

[18]However, the court need not determine if a state can so define marriage. *See supra* n. 1. *But see Goodridge v. Dept. of Public Health*, 798 N.E.2d 941, 969 (Mass. 2003) (discrimination in marriage against same-sex couples unconstitutional under state constitution); *Baker v. State*, 744 A.2d 864, 885 (Vt. 1999) (exclusion of same sex couples from marriage is unconstitutional); *Devlin v. Philadelphia*, 862 A.2d 1234 (Penn. 2004) (where ordinance allowing Life Partnership benefits to same-sex couples did not violate state law defining marriage as between a man and a woman).

bears a reasonable relation to a legitimate legislative end.[19]  *Heller v. Doe*, 509 U.S. 312, 319-320 (1993).  Further, the fit between the law and its purpose need not be a perfect one. *Id.* at 321.

The plaintiffs rely on *Romer*, 517 U.S. 620, in support of their contention that Section 29 is a denial of equal protection.   In *Romer,* Colorado voters adopted a statewide referendum to the Colorado state constitution, known as "Amendment 2," that precluded all legislative, judicial, executive, and local action that would protect the status of persons based on their "homosexual, lesbian or bisexual orientation, conduct, practices or relationships." *Id.*  The Supreme Court invalidated Colorado's constitutional amendment, finding that it imposed a broad disability on homosexuals, and no others, by prohibiting them from seeking or receiving specific legal protections without a legitimate state objective. *Id.* at 627.  The Court found  that denial of the right to obtain specific protections from the law is a "denial of equal protection in the most literal sense." *Id.* at 621.

The Court determined that the amendment was both too narrow and too broad. *Id.* at 633.  It found that the breadth of the amendment was so far removed from the professed justifications for the amendment that it raised the "inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.* at 634-35; *see also Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (noting that a bare desire to harm a politically unpopular group can never constitute a legitimate governmental interest).  As a result of the amendment, the Court found that "[h]omosexuals, by state

---

[19]As discussed in the First Amendment section of this opinion, heightened scrutiny is applied to legislation that touches on a "specific prohibition of the Constitution, such as those in the first ten amendments" or that "restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation." *United States v. Carolene Products*, 304 U.S. 144, 152 n.4 (1938).  In light of the court's findings, the court need not engage in strict scrutiny analysis.

decree, are put in a solitary class with respect to transactions and relations in both the private and governmental spheres." *Romer,* 517 U.S. at 627.  The Court admonished:

> We cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective.  It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit.

*Id.* at 635 (also noting "that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else"). The Court further concluded that laws of general application did not provide a sufficient safe harbor for this class of persons.  *Id.* at 631 (stating "[h]omosexuals are forbidden the safeguards that others enjoy or may seek without constraint.  They can obtain specific protection against discrimination only by enlisting the citizenry of Colorado to amend the State Constitution or perhaps, on the State's view, by trying to pass helpful laws of general applicability").

The court finds that Section 29 is indistinguishable from the Colorado constitutional amendment at issue in *Romer*.  Although not mentioned by name, the State has focused primarily on the same class of its citizens as did Colorado.  Through Section 29, the State of Nebraska attempts to limit the rights of that same class to obtain legal protections for themselves or their children in a "same-sex" relationship "similar to" marriage.  Ex. 28. Like the amendment at issue in *Romer*, Section 29 attempts to impose a broad disability on a single group.  Also, as in *Romer*, the lack of connection between the reach of the amendment and its purported purpose is so attenuated that it provides evidence that Section 29 has no rational relationship to any legitimate state interest.

The reach of Section 29 is at once too broad and too narrow to satisfy its purported purpose of defining marriage, preserving marriage, or fostering procreation and family life.

It is too narrow in that it does not address other potential threats to the institution of marriage, such as divorce.  It is too broad in that it reaches not only same-sex "marriages," but many other legitimate associations, arrangements, contracts, benefits and policies. *See* First Amendment discussion, *supra*.  The language of Section 29, stating that "the uniting of two persons of the same sex in a civil union, domestic partnership, or other similar same-sex relationship shall not be valid or recognized in Nebraska," prohibits a class of citizens from accessing the Nebraska Unicameral to advocate for the full array of benefits afforded to the other citizens of the State of Nebraska.  "[T]he principle that government and each of its parts remain open on impartial terms to all who seek its assistance" is "[c]entral both to the idea of the rule of law and to our own Constitution's guarantee of equal protection."  *Romer*, 517 U.S. at 633.

Moreover, the court finds that Section 29 was designed against the class it affects, making it status-based.  *See Romer*, 517 U.S. at 635.  Section 29 goes so far beyond defining marriage that the court can only conclude that the intent and purpose of the amendment is based on animus against this class.  *See, e.g., id.*  "The obvious animus of the part affects the whole."  *See* Akhil Reed Amar,  *Attainder and Amendment 2: Romer's Rightness*, 95 Mich. L. Rev. 203, 220 (1996).  Although Section 29 does not identify "gay, lesbian and homosexual" couples by name as the amendment did in the *Romer* case, it is clear that the purpose of Section 29 is to deny access to the legislative process by this group of citizens (or by people who would lobby on their behalf).  The evidence shows that the intention of Section 29 is to make this class of people unequal, thereby disadvantaging a group, a purpose that violates the Equal Protection Clause of the United States

31

Constitution.[20]  *Id.* at 635 (noting "[a] State cannot so deem a class of persons a stranger to its laws").

The court finds Section 29 is a denial of access to one of our most fundamental sources of protection, the government.  Such a broad exclusion from "an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society" is "itself a denial of equal protection in the literal sense."  *Id.* at 633, 631.  "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group . . . [the injury] is the denial of equal treatment resulting from the imposition of the barrier. . . ."  *Northeastern Fla. Chapter v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  It is this "inability to compete on an equal footing" that violates the Equal Protection Clause.  *Id.*  Individuals must be able to be free of undue government interference, and must be able to participate equally in the political process.

The State contends that *Romer* is distinguishable because the Colorado amendment operated to nullify or change existing ordinances while Section 29 "merely [makes] the historical, pre-existing legal status of same-sex couples a part of the Nebraska Constitution."  The State further distinguishes *Romer* because the Colorado amendment was a sweeping and broad constitutional amendment, while Section 29 is narrow and deals only with "marriage."  These contentions lack merit.  The troubling aspect of the amendment at issue in *Romer* was not its retrospective application to existing ordinances, but its prospective effect.  *See Romer*, 517 U.S. at 631 (noting the "special disability"

---

[20]The court need not determine whether, once a law is found to be directed at a "politically unpopular group," more searching scrutiny is required.  *See, e.g.*, *Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring).

imposed on homosexuals was forbidding them the safeguards that others may seek).  As discussed earlier in this opinion, the sweep of Section 29 reaches to issues beyond marriage—to existing contracts, regulations, and benefits that may be  conditioned upon a civil union or domestic partnership (i.e., medical leave act, adoption, insurance benefits, and so forth).  In this case, the plaintiffs have not only been denied any potential benefits premised on a same-sex relationship, they have been prohibited from seeking those benefits.

The State's focus on the political nature of this case misses the mark.  This case is about a fundamental right of access to the political process, not about the end result of that process.  It matters not that the group is gay and lesbian.  Members of all groups, which include those that are controversial, have a fundamental right to ask for the benefits and protections from the government.  As discussed herein, Section 29 goes beyond a mere definition of marriage.  Plaintiffs are denied access to the legislative process that is afforded to all citizens of the State of Nebraska.  As previously set forth, the Nebraska Attorney General interprets Section 29 to mean that any proposed legislation that would give rights to domestic partners would violate Section 29.  Ex. 28.  Thus, Section 29 makes it more difficult for this group, a minority, to enact favorable legislation.

The State contends that a majority of Nebraska citizens have decided that Section 29 is the will of the people.  In most instances, the popular vote carries much weight and should be afforded great deference.  However,  "[o]ne's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943).  Further, "[a] citizen's constitutional rights can hardly be infringed simply because a majority

of the people choose that it be." *Lucas v. Forty-Fourth Gen. Assembly of Colo.*, 377 U.S. 713, 736 (1964).

"[The framers of the Bill of Rights] knew times can blind us to certain truths and later generations can see the laws once thought necessary and proper in fact serve only to oppress." *Lawrence v. Texas*, 539 U.S. at 579. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Dep't. of Agriculture v. Moreno*, 413 U.S. at 534. The court finds that Section 29 inflicts "immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it." *Romer*, 517 U.S. at 635.

The court also finds that even if the goal of preservation of the traditional definition of marriage is a worthy and legitimate goal, there is an inadequate fit between that goal and the breadth of Section 29. The State may have a "societal interest in 'providing the institutional basis for defining the fundamental relational rights and responsibilities of persons in organized society'" and promoting family stability that could be satisfied by "expanding the rights and creating responsibilities of registered domestic partners" to further the state's "interests in promoting family relationships and protecting family members. . . ." *Knight v. Superior Court*, 26 Cal. Rptr. 3d at 698 (quoting *Laws v. Griep*, 332 N.W.2d 339, 341 (Iowa 1983)). A total prohibition on any future establishment or recognition of domestic partnerships, civil unions, or undefined relationships "similar to " marriage does not advance this goal and may, in fact, prevent it. In other words, preserving the traditional definition of marriage as a relationship involving a man and a

34

woman, and an eventual recognition of expanded rights in the nature of those extended in other states to domestic partners or civil unions are not mutually exclusive.

"The breadth of the amendment is so far removed from these particular justifications" that the court finds it impossible to credit them. *Romer*, 517 U.S. at 635. Section 29 prohibits any recognition of a "domestic partnership," "civil union," or "same-sex relationship." By its terms, Section 29 prohibits contracts, benefits and arrangements that already receive recognition in various forms in Nebraska.[21] Under Nebraska law, "domestic partnership" is a term of art, given a technical meaning in the Uniform Partnership Act, Mergers and Acquisitions, Neb. Rev. Stat. § 67-451(2). "Domestic" in relation to "partnership" is defined as a business entity formed in this state. See, for example, Neb. Rev. Stat. §§ 21-199; 21-20,109; 21-2603; 21-2652; 25-530.08; 44-1802; 59-1401; 67-233; 67-235; 67-248.0. Accordingly, a domestic limited partnership composed of same-sex partners as defined in the Partnership Act could run afoul of Section 29 as it is written.

---

[21]Many companies and governmental subdivisions are already giving such benefits to their employees. By 2003, the list of employers offering family health benefits to same-sex couples included "187 colleges and universities; 162 local governments; and ten state governments." Judy Greenwald, *More U.S. Employers Seen Adding Benefits for Domestic Partners*, Bus. Ins., Aug. 11, 2003, at 3. In 2004, "[s]eventy percent of the top 500 companies offer[ed] domestic-partner benefits for same-sex couples, according to a December Business Week Report. That's up from 25% in 2000." Chuanpis Santilukka, *Same-Sex Benefits Key to Marriage Debate*, St. Cloud Times, Mar. 24, 2004 at 4A. Further, over 7000 companies "offer health benefits to same-sex domestic partners." James Ricci & Patricia Ward Biederman, *Acceptance of Gays on Rise, Polls Show*, L.A. Times, Mar. 30, 2004, at B1. Belgium, the Netherlands, Spain, Iceland, Sweden and Canada have afforded some marital rights to same-sex couples. Clifford Krauss, *Canada Supreme Court to Hear Arguments on Same-Sex Marriage*, N.Y. Times, Oct. 6, 2004, at A7. Most recently, the Montana Supreme Court found that Montana universities must offer health insurance to gay employees' partners. *Snetsinger v. Montana University System*, 104 P.3d 445 (Mont. 2004), and an Arkansas trial judge struck down a regulation that barred gays from being foster parents under a separation of powers analysis. *Howard v. The Child Welfare Agency Review Bd.*, 2004 WL 3154530 (Ark. Cir. Ct. 2004). Additionally, many states and city governments are now offering benefits and rights to same-sex couples, for example, Vermont, Washington, Oregon, Hawaii, New York, Massachusetts, Connecticut, Phoenix and Tucson. *See Standhardt v. State of Arizona*, 77 P.3d 451, 463 n. 17 (Ariz. 2004). In 2003, California's Governor Gray Davis signed into law a statute requiring state contractors to provide health-care benefits to domestic partners. *Equal Benefits in State Contracting*, AB 17, Chpt. 752. *See also* Lisa Bennett and Gary Gates, *The Cost of Marriage Inequality to Gay, Lesbian and Bisexual Seniors: A Human Rights Campaign Foundation Report*, http://www.urban.org/url.cfm?ID=410939, January 21, 2004 (discussing the financial burdens on senior same-sex couples due to discriminatory laws).

"Union" is defined as "an unincorporated association of persons for a common purpose." Black's Law Dictionary at 1532 (6th ed. 1990). Section 29 could affect the ability of private parties to make contracts, such as real estate transactions, prenuptial agreements and business agreements in Nebraska. *See, e.g.*, Jill Schachner Chanen, *Marriage Law Could Reach Contracts*, 3 No. 28 A.B.A. J. E-Report (July 16, 2004); Christopher Rizzo, *Banning State Recognition of Same-Sex Relationships: Constitutional Implications of Nebraska's Initiative 416*, 11 J.L. & Pol'y 1 at 57-58.

The court envisions many situations involving "civil unions" that could run afoul of Section 29. For example, Section 29 could render a lease agreement involving two same-sex persons who share an apartment (traditionally known as "roommates") invalid, depending on the interpretation of "similar same-sex relationship." Without governmental inquiry into the intimate sexual practices of its citizens, there is simply no way for the State of Nebraska to know whether, or not, a relationship or living arrangement is in the nature of, or similar to, a marital relationship. *See also* First Amendment discussion, *supra*. Accordingly, the court finds that Section 29 violates the Equal Protection Clause of the Constitution of the United States. *See Romer v. Evans*, 517 U.S. at 620.

## C. Bill of Attainder[22]

Plaintiffs also allege that Section 29 is a bill of attainder. Plaintiffs argue that Section 29 violates the Bill of Attainder Clause by singling out gays and lesbians for legislative punishment. The court previously found that plaintiffs' complaint had adequately stated a claim for the violation. *Citizens for Equal Protection v. Bruning*, 290 F. Supp.2d 1004,

---

[22]Although the court's decision with respect to the First and Fourteenth Amendment issues is dispositive, the resolution of the bill of attainder claim likewise stands on its own merits.

1008-1011 (D. Neb. 2003). After review of the record, in particular Exs. 27, 28, 29 and 30, and Affidavit Exs. 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48 and 50, the court finds that plaintiffs have shown that Section 29 is an unconstitutional bill of attainder. The analysis and reasoning in the court's previous Memorandum and Order remains applicable and is incorporated herein.

Article I, section 9 of the Constitution provides that "[n]o Bill of Attainder . . . shall be passed." U.S. CONST. art. I, § 9, cl. 3. This provision prohibits Congress from enacting "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 468 (1977). To be considered a bill of attainder, a legislative act must (1) apply to named individuals or easily ascertainable members of a group, (2) inflict punishment, and (3) be without judicial trial. *United States v. Lovett*, 328 U.S. 303, 315 (1946). The Bill of Attainder Clause is "to be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups." *United States v. Brown*, 381 U.S. 437, 447 (1965). *See also Amar, supra* at 203-235 (an historical overview of Bill of Attainder as it relates to Equal Protection Clause and *Romer v. Evans*, 517 U.S. 620 (1996)) ("Without the nonattainder principle, the legislature would simply single out its enemies—or the politically unpopular—and condemn them for who they are. . . ."). *Id.* at 210. The law "is an attainder because, despite its dishonest protestation, it fails the requisite test of generality and prospectivity. It makes it a capital crime to be who I am. Put another way, it wrongly designates criminals rather than crimes." *Id.* at 211.

The legislative act should either name persons to be punished or describe them in terms of conduct that operates only as a designation of particular persons. *Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 847 (1984) (applied to group of people who failed to register for the draft). This specificity requirement is met when the law applies to "easily ascertainable members of a group." *Brown*, 381 U.S. at 448-49, 461 (also noting that historically it was not that unusual for the English bills of attainder "to inflict their deprivations upon relatively large groups of people, sometimes by description rather than name"). "One century ago, the first Justice Harlan admonished this Court that the Constitution 'neither knows nor tolerates classes among citizens.'" *Romer,* 517 U.S. at 623, quoting *Plessy v. Ferguson,* 163 U.S. 537, 559 (1896) (Harlan, J., dissenting).

In the present case, the court finds that Section 29 both names specific groups and describes them in terms of their conduct. By its terms, Section 29 targets the specific group of people who have entered into, will enter into, or seek to enter into "civil unions" and "domestic partnerships" and describes the group's conduct as "the uniting of two persons of the same sex." Consequently, the court concludes that plaintiffs have shown Section 29 applies to an easily ascertainable group.

There is no dispute that Section 29 operates without judicial trial before preventing the legal recognition of same-sex relationships. All parties appear to concede this issue, and the court concludes that this requirement has likewise been satisfied.

The determinative factor in this case is whether Section 29 can be seen to inflict punishment. Plaintiffs contend that Section 29 effectively disenfranchises lesbian, gay and bisexual people and their supporters as they can no longer petition their representatives and city and local governments for legislative changes that would protect their relationships,

38

agreements, and interests.  Plaintiffs argue that this type of disenfranchisement is the equivalent of punishment.  In deciding whether a legislative act inflicts punishment, the court conducts three necessary inquiries:  (1) whether the challenged legislation falls within the historical meaning of legislative punishment, (2) whether the statute can be said to further nonpunitive legislative purposes, and (3) whether the legislative record shows a congressional intent to punish.  *Selective Serv. Sys.*, 468 U.S. at 852; *Planned Parenthood v. Dempsey,* 167 F.3d 458, 465  (8th Cir. 1999).  Historically, bills of attainder imposed the death penalty, but the concept has been expanded to include lesser penalties such as "legislative bars to participation by individuals or groups in specific employment or professions."  *Selective Serv. Sys.,* 468 U.S. at 852.; *See also Brown*, 381 U.S. 437 (involving Communist Party members barred from labor union); *United States v. Lovett*, 328 U.S. 303 (1946) (involving salary cuts for three government employees); *Cummings v. Missouri*, 71 U.S. 277 (1866) (involving disqualification of priest from the clergy); and *Ex Parte Garland*, 71 U.S. 333 (1866) (involving lawyers barred from practice of law).

One type of forbidden punishment is "'the doctrine of disqualification, disenfranchisement, and banishment by the acts of the legislature.'"  *Brown*, 381 U.S. at 444, quoting III (John C.) Hamilton, *History of the Republic of the United States*, p. 34 (1859) quoting Alexander Hamilton.  "[I]f the legislature can disenfranchise any number of citizens at pleasure by general descriptions, it may soon confine all the votes to a small number of partisans, and establish an aristocracy or oligarchy. . . .").  *Id.*

In this way a legislative act that singles out a group and restricts its ability to effect political change amounts to punishment and can be a bill of attainder.  *See Brown*, 381 U.S. at 448.  The court finds that Section 29 is directed at gay, lesbian, bisexual and

transsexual people and is intended to prohibit their political ability to effectuate changes opposed by the majority. *See id.* at 442. Section 29 operates as a legislative bar for these specified groups. Accordingly, the court finds that the challenged legislation falls within the historical meaning of the term punishment.

The factors of legislative purpose and intent to punish are overlapping. The State argues that the purpose of Section 29 is to retain the traditional meaning of the word "marriage" as being between a man and a woman and, thus, it does not punish or prohibit any conduct. Plaintiffs, on the other hand, contend that "Section 29 imposes punishment by depriving lesbian, gay and bisexual people of their civil and political rights to attempt to persuade their governmental representatives and employers to protect their intimate relationships and by singling them out for moral censure." Pls.' Brief in Opp'n to Mot. to Dismiss, Filing No. 30 at 32. Plaintiffs further contend that Section 29 was motivated purely to prevent gays and lesbians from accessing the political system and to render them second-class citizens. *See,* i.e.*,* Filing No. 1, ¶ 21 (comments by Guyla Mills, who led the petition drive, stating that Section 29 was to make known that homosexual and heterosexual marriages are not equivalents and that homosexual relationships are morally inferior). In its brief the State admits that Section 29 limits plaintiffs' access to the legislative process. "There is no civil right to control the terms on which a political battle will be fought, i.e., on a local, employer-by-employer, or legislative level rather than on a state-wide voter initiative level." Filing No. 66, Defs.' Trial Brief at 1. "[T]hey do not have a constitutional right to win or force the battle to be fought on their terms." *Id.* These statements make it clear that the intent of Section 29 is to silence the plaintiffs' views and dilute their political strength.

40

Importantly, prior to the enactment of Section 29, plaintiffs had the right to freely access and use the political process, in particular, the legislature. As previously discussed, the court finds that Section 29 inhibits government employers from offering benefits to certain employees and inhibits plaintiffs from advocating or lobbying for legislation that would extend any protections to same-sex couples. The evidence supports plaintiffs' contention that the adoption of Section 29 was motivated, to some extent, by either irrational fear of or animus toward gays and lesbians. "[T]he vice of attainder is that the legislature has decided for itself that certain persons possess certain characteristics and are therefore deserving of sanction. . . ." *Brown*, 381 U.S. at 449 n.23. The court finds that the principles announced in *Brown* are applicable to Section 29, because plaintiffs have shown that Section 29 is intended to deny access to all levels of the government to anyone who advocates for extension of benefits and protections to same-sex couples.

The court finds the effect of Section 29 amounts to punishment. Legislation that "identifies persons by a single trait and then denies them protection across the board," resulting in "disqualification of a class of persons from the right to seek specific protections from the law is unprecedented. . . ." *Romer,* 517 U.S. at 633. Laws "declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense."[23] *Id*. Such laws "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id*. at 634. It is clear that the government can regulate conduct, e.g., criminal activity, but the government "may not create classes

---

[23]Again, the Bill of Attainder analysis dove-tails with the First Amendment and Equal Protection issues in this case.

among its citizens on the basis of who they are rather than what they do." *Amar, supra* at 222.

Section 29 is distinguishable from statutes that serve nonpunitive purposes and are thus valid. *See, e.g., Dempsey*, 167 F.3d at 465 (removal of funding for abortion services deemed to support nonpunitive purpose of removing State's approval from abortion services); *Selective Service System*, 468 U.S. at 858-59 (denial of financial aid to males who would not register for draft not punishment where goal was to make males register); and *United States v. O'Brien*, 391 U.S. 367, 385-86 (1968) (conviction for burning Selective Service card not punitive where nonpunitive goal was to continue availability of Selective Service certificates). Section 29 does not merely withhold the benefit of marriage; it operates to prohibit persons in a same-sex relationship from working to ever obtain governmental benefits or legal recognition, a right they had before the passage of Section 29. If the purpose, as offered by the proponents of Section 29, were merely to maintain the common-law definition of marriage, there would be no need to prohibit all forms of government protection or to preclude domestic partnerships and civil unions. The court concludes that the plaintiffs have established that Section 29 is an unconstitutional bill of attainder.

Accordingly, the court finds in favor of the plaintiffs and against the defendants. Because the plaintiffs are the prevailing parties pursuant to 42 U.S.C. § 1988, the court shall award attorney fees in this case. An Order of Judgment in conformity with this Memorandum and Order will issue this date.

THEREFORE, IT IS ORDERED that:

1.   Section 29 of the Nebraska Constitution is hereby declared unconstitutional and enforcement of the same is permanently enjoined.

2.   Attorney fees and costs shall be awarded to the plaintiffs as the prevailing parties in this case. The plaintiffs have thirty days from the date of this Memorandum and Order to file an appropriately supported and documented request for attorney fees. Thereafter, defendants shall have thirty days to respond to the request for attorney fees.

3.   Governor Dave Heinemann is substituted as party defendant for Michael Johanns.

4.   A separate judgment shall be entered herein.

Dated this 12th day of May, 2005.

BY THE COURT:


s/Joseph F. Bataillon
JOSEPH F. BATAILLON
UNITED STATES DISTRICT JUDGE

43